*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEVEN RUSSELL BRCIC,

Defendant-Appellant.

FOR PUBLICATION
March 09, 2026
9:46 AM

No.   362727; 366230
Cheboygan Circuit Court
LC Nos.  2022-006325-FH; 2020-
006006-FH

Before:  ACKERMAN, P.J., and YOUNG and KOROBKIN, JJ.

ACKERMAN, P.J. (*concurring in part and dissenting in part*).

In *People v Milbourn*, 435 Mich 630, 661; 461 NW2d 1 (1990), our Supreme Court observed that "even a sentence within the sentencing guidelines could be an abuse of discretion in unusual circumstances."  The "unusual circumstances" standard has been repeated often in the decades since, but no case has ever found it satisfied.[1]  That is, until today.  For the first time, this Court sets aside a within-guidelines sentence as substantively unreasonable.  It also vacates an upward departure that the sentencing judge thoughtfully tailored to a defendant with an extraordinary and deeply troubling criminal history.  The combined effect is not error correction but a narrowing of trial court sentencing authority that leaves neither adherence to the guidelines nor principled departure from them secure from appellate revision.

While I concur with the majority's decision to affirm defendant's convictions, I dissent from the decision to vacate defendant's sentences and remand for resentencing.  Over more than three decades, defendant has amassed 14 felony and 12 misdemeanor convictions, repeatedly violated probation and parole, and demonstrated a persistent and dangerous pattern of alcohol-related offending, culminating in this, his *fifth* conviction for *third*-offense operating while intoxicated (OWI-3rd).  On this occasion, he paired reckless drunk driving through a public recreation area with five counts of resisting and obstructing a police officer, and he then

---

[1] Indeed, *Milbourn* itself merely cited another opinion noting, hypothetically, that a within-guidelines sentence could constitute an abuse of discretion.  See *Milbourn*, 435 Mich at 661, citing *People v Broden*, 428 Mich 343, 354 n 18; 408 NW2d 789 (1987).

-1-

compounded that conduct by possessing a weapon in jail while awaiting trial. Confronted with that record, the trial court imposed an upward-departure sentence for OWI-3rd grounded in the demonstrated need for incapacitation, as well as a within-guidelines sentence for prisoner in possession of a weapon (PPW).

In second-guessing the sentences imposed, today's decision departs from settled standards of appellate review in a manner that will reverberate through sentencing jurisprudence in innumerable future cases, leaving trial courts and future panels of this Court to grapple with whether its rationale can be distinguished. The decision treats a within-guidelines sentence as subject to substantive recalibration based on mitigating factors the law does not require sentencing courts to consider, and it identifies "unusual circumstances" sufficient to overcome the presumption of proportionality in conduct that represents the most ordinary application of the PPW statute. At the same time, it invalidates an upward departure not because it lacks record support, but because the trial court considered defendant's conduct comparably serious to repeat violent offenders—an analogy that I believe was wholly reasonable. The majority's approach dilutes abuse-of-discretion review, drains the concept of "unusual circumstances" of its limiting force, and invites appellate micromanagement of sentencing decisions committed by law to the trial court. Because the sentences imposed were lawful, reasoned, and proportionate to both the offenses and the offender, I respectfully dissent.

## I. FACTS

The facts here are critical.

A police officer first encountered defendant Steven Brcic sitting in a parked Chevrolet Tahoe in the Cheboygan Walmart parking lot with an open container of beer in the center console. The officer warned defendant not to drive. Had defendant followed that directive, he could have avoided any criminal consequences altogether. Within minutes, however, defendant ignored that warning and drove off. About an hour and a half later, defendant was observed driving recklessly through a public recreation area in Indian River, a significant distance away from the Walmart. He swerved toward a group of teenagers, yelled at them from his vehicle, and ultimately crashed. He then jumped into Indian River and, defying repeated police commands to come to shore and submit to arrest, backstroked down the river away from the officers. Only after he was taken into custody was his blood alcohol content measured at 0.2266, nearly three times the legal limit.

Defendant's dangerously drunken drive did not occur in isolation. Rather, its backdrop was more than 30 years of criminal conduct, including seven felony and nine misdemeanor prior convictions.[2] That record includes an extraordinary and persistent pattern of alcohol-related offenses: a 1995 OWI; a 1997 operating under the influence of liquor (OUIL); a 1997 drunk and disorderly; a 1998 attempted OUIL; a 1999 OUIL third offense; a 2005 OWI third offense; a 2011 OWI third offense; a 2015 attempted drunk and disorderly; a 2016 OWI third offense; a 2019 attempted drunk and disorderly conviction; and the present offenses. Defendant also accumulated

---

[2] This total does not include an additional misdemeanor offense committed when defendant was a juvenile.

multiple violent convictions, including sexual assault and assaultive misdemeanors, repeatedly violated probation and parole, and was also adjudicated for juvenile arson.

While awaiting trial in the Cheboygan County Jail, defendant violated the jail's razor-distribution policy by manipulating a razor into a weapon, which he used to attempt suicide. Although the attempt was ultimately unsuccessful, it required the involvement of as many as eight officers and necessitated the entry of emergency medical responders into the facility to transport defendant to a hospital. Juries later found defendant guilty of another three misdemeanors and seven felonies, including five counts of resisting and obstructing a police officer and the OWI-3rd and PPW convictions at issue in this appeal.

Against this record, the trial court imposed (1) a within-guidelines minimum sentence of 58 months for defendant's PPW conviction and (2) an upward-departure sentence of 25 to 50 years for OWI-3rd. Although the majority upholds defendant's convictions, it sets aside both sentences as disproportionate. I disagree with granting defendant any relief.

## II. SENTENCING GENERALLY

For over 40 years, a series of Michigan appellate decisions has steadily chipped away at the sentencing scheme enacted by our Legislature. When the Legislature entrusted sentencing to broad judicial discretion, appellate decisions curtailed that in the name of consistency. When the Legislature later adopted laws to promote consistency, courts held that those laws unconstitutionally constrained judicial discretion. The consistent through line has been appellate courts derogating from legislative policy choices.

"Michigan initially had a purely indeterminate sentencing system, in which the judge possessed unfettered judgment to sentence a defendant anywhere between no jail time and imprisonment in the amount of the statutory maximum." *People v Lockridge*, 498 Mich 358, 415 n 8; 870 NW2d 502 (2015) (MARKMAN, J., dissenting). Consistent with that scheme, in *Cummins v People*, 42 Mich 142, 144; 3 NW 305 (1879), the Supreme Court held that for any sentence authorized by statute, appellate courts "ha[ve] no supervising control over the punishment that shall be inflicted." Over time, however, the Supreme Court "came to disfavor the sentencing disparities that resulted from this type of unrestricted judgment." *Lockridge*, 498 Mich at 415 n 8. *Cummins* was overruled in favor of abuse-of-discretion review on appeal. *People v Coles*, 417 Mich 523, 550-551; 339 NW2d 440 (1983).[3] Later still, the Supreme Court "enacted judicial sentencing guidelines in 1984 by administrative order." *Lockridge*, 498 Mich at 415 n 8.

That arrangement was further refined when the Legislature adopted the statutory sentencing guidelines in 1998. See 1998 PA 317. Under that framework, every felony is assigned a classification level (A through H).[4] The guidelines include "offense variables" (OVs) and "prior record variables" (PRVs), with instructions directing the sentencing judge to assess points based

---

[3] *Coles* was later partially overruled by *Milbourn*, 435 Mich at 635-636, which rejected *Coles'* "shock the conscience" standard in favor of the "principle of proportionality."

[4] As well as a special "M2" classification for second-degree murder. MCL 777.16p.

on facts—found by the judge—regarding both the sentencing offense and the defendant's criminal history. Each classification level contains a sentencing grid divided into cells that recommend a range of minimum sentences. As enacted, the statute required sentencing judges to impose a minimum sentence within the applicable range absent a "substantial and compelling reason" to depart, whether upward or downward. See MCL 769.34(3) (as adopted).

By constraining judicial discretion, this system promoted greater consistency in criminal sentencing. But it also depended heavily on judge-found facts. Many offense variables concerned considerations not intrinsic to the offense of conviction—for example, whether a "vulnerable victim" was "exploited," MCL 777.40. Because those facts increased the minimum sentence the defendant faced but were not found by a jury, the Supreme Court held that the mandatory guidelines violated the constitutional right to trial by jury. *Lockridge*, 498 Mich at 373-374 (majority opinion).

Having reached that conclusion, the Court was required to fashion a remedy. The defendant in *Lockridge* urged the Court "to require juries to find the facts used to score all the OVs that are not admitted or stipulated by the defendant or necessarily found by the jury's verdict." *Id*. at 389. The Court rejected that approach because of "the profound disruptive effect it would have in every case," effectively "turn[ing] sentencing proceedings into mini-trials." *Id*. Instead, the Court rendered the guidelines "advisory only." *Id*. at 391. It did so in part because this remedy "requires the least judicial rewriting of the statute." *Id*.

As a result, the guidelines "remain a highly relevant consideration in a trial court's exercise of sentencing discretion." *Id*. A sentencing court is freely allowed to "exercise its discretion to depart from th[e] guidelines range without articulating substantial and compelling reasons for doing so," and such departures will "be reviewed by an appellate court for reasonableness." *Id*. at 391-92.

> [T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the "principle of proportionality" set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." [*People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017).]

The Supreme Court adopted this remedy to preserve as much of the Legislature's sentencing framework—and the consistency it sought to impose—as possible. Although out-of-guidelines sentences are now reviewed solely for reasonableness, "[w]ith regard to a within-guidelines sentence, there is a nonbinding presumption of proportionality," which the defendant bears the burden of rebutting. *People v Purdle (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 5 (cleaned up). This framework gives continuing force to the Legislature's sentencing policy while curing the constitutional defect identified in *Lockridge*.

## III. OWI

I begin with the sentence that will almost certainly control the amount of time defendant serves in prison. The majority concludes that the trial court abused its discretion and violated the principle of proportionality by upwardly departing from the recommended minimum sentence range of 19 to 76 months and imposing a 25-year minimum sentence for defendant's OWI-3rd conviction. I disagree.

Defendant has demonstrated a persistent inability to conform his conduct to what the law requires. To some extent, the sentencing guidelines recognize this reality; there is a reason his total PRV score was 75 points. But while the variables generally account for some number of defendant's prior convictions, they lose sight of just how extensive his criminal history is and give no meaningful consideration to his highly specific and repeated propensity to drive while intoxicated and the special risks that presents to the community.

Consider that under MCL 257.625(9)(c), enhanced penalties apply to individuals convicted of drunk driving "after 2 or more prior convictions" for the same offense, which is commonly referred to as OWI-3rd. The present conviction is not merely defendant's fifth felony conviction; not merely his fifth drunk-driving conviction; it is his *fifth OWI-3rd conviction*.[5] Admittedly, the Legislature has not created a special OWI-7th category, and the sentencing guidelines accordingly provide direction only for OWI-3rd convictions. But because OWI-3rd is classified as a Class E felony, MCL 777.12f, all of defendant's prior OWI-3rd convictions are subsumed, along with his *other* three prior felony convictions, within the 30 points assigned under PRV 2 for "low-severity felony convictions," a score that caps at "4 or more prior" such convictions. MCL 777.52(1)(a), (2)(a). In a similar fashion, defendant was assessed 10 points under OV 9 for placing "2 to 9 victims . . . in danger of physical injury or death," MCL 777.39(1)(c), but defendant's inebriated excursion from Cheboygan to Indian River likely exposed far more than nine people to grave risk.

These circumstances illustrate precisely why departures are permitted. As our caselaw recognizes, "relevant factors for determining whether a departure sentence is more proportionate than a sentence within the guidelines range . . . include" both "factors not considered by the guidelines" and "factors considered by the guidelines but given inadequate weight." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017). It would be unreasonable to require the Legislature to enact a punishment specifically tailored to a criminal history as unusually extensive as that of defendant. Nor would adding more points along the axes of the Class E grid adequately capture the severity of the problem. As the trial court observed at sentencing, "I do not believe that the law requires us to wait until Mr. Brcic kills someone [d]runk [d]riving before we do something about his absolute and utter refusal to stop doing it."

The majority does not seriously dispute these observations. It acknowledges that "the trial court correctly observed that the guidelines do not fully capture that Brcic is repeatedly engaging in the same type of criminal behavior and the future risk to the community this pattern of

---

[5] Nor does this account for defendant's 1998 offense, which was pleaded down to attempted OUIL but would otherwise have constituted a *sixth* OWI-3rd conviction.

criminality may create." Its disagreement instead concerns the *extent* of the departure—from 76 months at the top of the guidelines to the 300 months to which defendant was sentenced.[6] But its rationale is wanting.

The trial court's principal explanation for the extent of its departure was the analogy it drew to fourth-offense violent offenders. Under MCL 769.12(1)(a), such offenders must be sentenced to at least 25 years in prison,[7] and the trial court concluded that defendant "presents just as much risk of harm to the community as a fourth violent offender does." The majority faults the trial court for "implicitly equating the seriousness of Brcic's high-risk but nonviolent habitual conduct to the seriousness of conduct committed by habitual violent offenders." From these objections, the majority concludes that it "cannot identify anything about this offense or offender that would make a 25-year minimum sentence reasonable."

That reasoning has far-reaching consequences. If "implicitly equating the seriousness of Brcic's high-risk but nonviolent habitual conduct to the seriousness of conduct committed by habitual violent offenders" is impermissible, then the mere existence of a 25-year minimum for some violent offenses in MCL 769.12(1)(a) functions as a de facto ceiling on minimum sentences for any nonviolent offense.

The majority concedes that the guidelines did not adequately account for defendant's criminal history. Some adjustment was therefore warranted. Yet the majority forbids the trial court from making *this* adjustment because defendant's conduct is less "serious" than the conduct addressed in MCL 769.12(1)(a). The implication of today's holding is that defendant's *fifth* OWI-3rd (and *seventh* OWI overall) is somehow *categorically* less serious than a fourth violent felony. Would an eighth OWI overall suffice? A tenth? Or will future courts take as the lesson that no number of prior convictions for this "nonviolent" conduct can ever be treated as comparable to a fourth violent offense? If repeated nonviolent conduct presents a comparable degree of danger to the community as violent behavior, we should not forbid trial courts from drawing this kind of proportionality-based comparison simply because the Legislature has prescribed a similar term for a different category of repeat offenders.

Indeed, that approach conflicts with proportionality review itself. The principle of proportionality "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense *and the offender*." *Milbourn*, 435 Mich at 636 (emphasis added). Here, the trial court determined that the guidelines inadequately captured the offender-specific circumstances reflected in defendant's record and adjusted the sentence

---

[6] The majority's reasoning on this point is internally inconsistent within the span of a single sentence. It first asserts that "the trial court failed to justify the departure," implying that a more robust explanation could support the imposed prison term. But the very next words are "and we cannot identify anything about this offense or offender that would make a 25-year minimum sentence reasonable," suggesting that no explanation could suffice.

[7] It is worth noting that a minimum sentence under MCL 769.12(1)(a) can be considerably longer than 25 years. The statute only provides that qualifying habitual offenders be sentenced to "not less than 25 years."

accordingly. The majority faults that adjustment based on the sentence's similarity to one prescribed for violent offenders in MCL 769.12(1)(a), because defendant's conduct is less "serious." But this ignores the touchstone of proportionality review: the circumstances of the offense and the offender. Moreover, if "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range," *Steanhouse*, 500 Mich at 475 (citation omitted), then proportionality review cannot turn on whether a sentence happens to align with statutory penalties prescribed for other offenses.

The essence of the *Lockridge* remedy is that departure sentences are no longer examined under a jeweler's loupe. They are instead reviewed for abuse of discretion, which occurs only when the trial court violates the principle of proportionality. The trial court did not do so here. Defendant is a chronic recidivist who refuses to stop exposing his community to the risk of both criminal behavior in general and drunk driving in particular. Vacating this sentence not only undermines the balance *Lockridge* struck but risks reviving the appellate micromanagement that decision sought to avoid. If sentencing courts may not analogize to the Legislature's judgments about risk and punishment as relevant reference points, their sentencing decisions will be increasingly vulnerable to appellate second-guessing. Because trial courts will inevitably seek to avoid getting reversed on appeal, the net result will be an unwarranted constraint on judicial discretion.

## IV. PPW

I also disagree with the majority's decision to vacate defendant's PPW sentence. Under our precedents, a within-guidelines sentence is presumed proportionate, and the defendant bears the burden of overcoming that presumption. To do so, he must "present unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Ventour*, 349 Mich App 417, 430; 27 NW3d 660 (2023) (cleaned up). In this context, we have explained that " '[u]nusual' means 'uncommon, not usual, rare.' " *Id*. (citation omitted). In light of that definition, it is unsurprising that we have never held a within-guidelines sentence to be disproportionate on the basis of an "unusual circumstance." This case provides no sound reason to break that ground.

Defendant was convicted of possessing "any weapon or other item that may be used to injure a prisoner or other person." MCL 801.262(2). While awaiting trial, defendant violated the jail's razor-distribution policy by manipulating a razor into a weapon, which he then used in a suicide attempt. The object he possessed plainly qualifies as an item that "may be used to injure a prisoner," as defendant in fact used it to injure himself. Defendant's possession of this implement in the jail is not "unusual" as that term is defined in *Ventour*. It is, if anything, a garden-variety violation. This within-guidelines sentence should be affirmed without difficulty.

In an effort to avoid *Ventour*'s definition of "unusual"—and *Lockridge*'s effort to preserve the sentencing guidelines to the greatest extent possible—the majority focuses on the circumstances of defendant's offense, reasoning that defendant's "behavior is at the least extreme end" of the conduct "encompassed by the PPW statute." It observes that defendant "had no intent to harm anyone other than himself," "initially obtained the razor lawfully," and "had no cellmates at the time of his offense whom he could have harmed or who would have had access to the razor." The majority concludes that "individually each enumerated circumstance could be uncommon or

rare when sentencing a prisoner for possession of a weapon," and "[t]aken together" they are "unusual" under *Ventour*. This transforms our sentencing jurisprudence, for several reasons.

First, the majority's reasoning rests on factual premises not established in this record. We have no evidence regarding how often prisoners who possess weapons intend to harm others, initially obtain them lawfully, or lack cellmates at the relevant time (or, indeed, what a "typical PPW" consists of). Second, and more fundamentally, the statute contains no *mens rea* requirement; a defendant need not intend to injure anyone to violate it. It is irrelevant whether defendant "lacked intent and opportunity to harm another." Nor does the statute turn on whether the item was initially obtained lawfully or whether other inmates were immediately present. Rather, the gravamen of the offense is the possession of an item capable of causing injury within the jail environment.

Our precedent confirms this understanding. The statute at issue here, MCL 801.262(2), is "substantively identical" to MCL 800.283(4), differing only in its application to jails rather than prisons. *People v Gratsch*, 299 Mich App 604, 612; 831 NW2d 462 (2013), vacated in part on other grounds 495 Mich 876 (2013). And in *People v Krajenka*, 188 Mich App 661, 663-664; 470 NW2d 403 (1991), this Court confronted a single-object challenge under Const 1963, art 4, § 24, to MCL 800.281(4) and rejected it, holding that the statute served "the single object of maintaining order and discipline in a prison environment."[8]

Viewed through that lens, the purpose of MCL 801.262(2) is to maintain order and discipline by preventing inmates from possessing implements capable of inflicting injury *without regard* to the use intended for the item. Conflict may arise if other inmates learn that such an implement exists. And even where, as here, defendant injured himself before that knowledge could spread, the conduct itself compromised jail security. A squad's worth of law enforcement officers was diverted to respond to defendant's actions, intervening to prevent further injury, notifying other members of the county law enforcement hierarchy, and escorting emergency medical responders into and out of the jail to transport defendant to a hospital. Each step drew personnel away from their ordinary duties and undermined the jail's ability to maintain order and discipline. Defendant's presentence investigation report (PSIR) further notes that he made "a statement that apparently this event had an [effect] on some of the jail staff as at least two people quit."

The majority attempts to compare this situation to *Milbourn*, but the comparison is misplaced. In *Milbourn*, the defendant—who had no prior criminal record—was convicted of violating MCL 750.110, which at the time[9] prohibited breaking and entering "any occupied dwelling house, with intent to commit any felony or larceny therein" and carried a maximum penalty of 15 years in prison. Under *People v Tanner*, 387 Mich 683, 690; 199 NW2d 202 (1972), that meant the highest minimum sentence a trial court could impose was 10 years—two-thirds of

---

[8] Both MCL 800.281(4) and MCL 800.283(4) are part of the same public act, 1909 PA 17, so *Krajenka*'s remarks about the statute's purpose are equally applicable to both sections.

[9] The crime of home invasion was reorganized by 1994 PA 270, and this material was moved to MCL 750.110a.

the statutory maximum. The trial court imposed that maximum-minimum sentence, which the Supreme Court held was an abuse of discretion.

The defendant in *Milbourn* "broke into an apartment in which he himself had resided for the apparent purpose of making an emotional and destructive statement about the breakup of his relationship with the complainant." *Milbourn*, 435 Mich at 667-668. The Court explained that this conduct "d[id] not constitute a typical burglary" because "a more typical crime of that sort involves entry into the home of a stranger for the purpose of committing a larceny or an assault." *Id*. at 667. The Court further emphasized that the defendant "had no criminal record." *Id*. at 668. "[B]y sentencing Mr. Milbourn to the maximum possible term, [the trial judge] left no room for the principle of proportionality to operate on an offender convicted of a breaking and entering who has a previous record for this kind of offense or whose criminal behavior is more aggravated than in Mr. Milbourn's case." *Id*. at 668-669.

This case bears no resemblance to *Milbourn*. To begin with, although "[t]he burglary statute under which Mr. Milbourn was convicted proscribe[d] a broad range of criminal conduct," *id*. at 668, the statute at issue here is far narrower. The statute in *Milbourn* required that the defendant intended to commit some other criminal act, and those acts had a range of seriousness. By contrast, MCL 801.262(2) contains no requirement of further criminal intent; it targets the inherent instability caused by the presence of contraband capable of causing injury in a jail environment. To the extent any range of seriousness is contemplated, it lies in the dangerousness of the possible "injury"—itching powder might also "injure" fellow inmates, but it would do so nonlethally.

Moreover, *Milbourn*'s concern about preserving room for more aggravated offenses arose in the context of a trial court imposing the *maximum constitutionally permissible sentence* on a first-time offender. Here, by contrast, the trial court imposed a *within-guidelines* sentence that was well below the statutory maximum and did so for a defendant with an extensive criminal history.

Applying *Milbourn*'s concept of "leaving room" to invalidate a within-guidelines sentence is a third fundamentally transformative holding. Defendant was assessed 75 PRV points and 25 OV points, placing him in cell F-III of the Class E grid, which recommends a minimum sentence of 14 to 29 months. MCL 777.66. The upper limit was doubled to 58 months because of defendant's criminal history. MCL 777.21(3)(c). Cell F-III encompasses defendants with 75 or more PRV points and 25 to 34 OV points, meaning defendant had the minimum scores necessary to fall within that cell.

Under our caselaw, therefore, *any* minimum sentence between 14 and 58 months was presumptively proportional. Yet the majority rejects a sentence at the top of that range because defendant "lawfully obtained the razor, did not have a cellmate, used the razor against himself alone with the intent of ending his life, and disposed of the razor in his toilet before his injuries immobilized him." These considerations are all unrelated to the social harm the PPW statute is designed to prevent. Each one is also a reason he did not accumulate additional OV points; he landed in cell F-III on the Class E grid because his criminal history and conduct threatening a penal institution generated sufficient points to place him there. The majority's reasoning therefore sits uneasily with the Legislature's decision to assign 25 OV points for a threat to the security of a penal institution. MCL 777.49(a).

The majority frames the guidelines as having considered "most if not all of the negative circumstances of the offender" but not countervailing aspects of the offense itself, yet its analysis rests on mitigating inferences that the record does not clearly support. The majority characterizes defendant's act of placing the razor in the toilet as "dispos[ing] of the razor," as though he were scrupulously containing the risk of harm to others. But he could just as easily have been attempting to conceal evidence of his offense in the event that his suicide attempt proved unsuccessful. Indeed, according to an officer who searched the cell, "[t]here was a rag or toilet paper . . . in the toilet as well."

In any event, recasting defendant's purported acts of restraint as mitigating the "negative circumstances" of his offense amounts to awarding defendant anti-points for not committing hypothesized crimes or aggravating acts. The fact that we can imagine ways this situation could have been worse does not make what defendant *did* do any less of a threat to the security of the Cheboygan County Jail, nor does it make defendant any less of a recidivist who merits a severe punishment.

Most importantly, the majority's objections to the trial court's sentence are exclusively offense-specific. Although it recites the familiar formulation that defendant's sentence "is disproportionate given the circumstances of Brcic's offense and of Brcic as an offender," repetition of the offender component cannot obscure the reality that it plays no role in the analysis. The majority relies solely on aspects of the offense itself to mandate a reduced sentence. That implies that less serious conduct *must* be punished less severely, irrespective of the defendant's criminal history. The effect is to impose a judicial cap on where within a guidelines range a defendant may be sentenced based solely on offense characteristics, discounting criminal history altogether. On that logic, a 58-month sentence would be appropriate only for a defendant who had accumulated something approaching the maximum 34 OV points and well in excess of the 75 PRV points necessary to qualify for cell F-III.[10] Any defendant whose numbers merely qualify him for the cell apparently merits a proportionate reduction *within* the cell.

That approach effectively converts the sentencing grid from a system of discrete ranges into a continuous spectrum. Needing to know where *within* a cell a defendant's scores fall cannot be reconciled with our caselaw holding that when "the trial court's sentencing error does not alter the imposed sentencing guidelines range, resentencing is not required." *People v Charboneau*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 364596); slip op at 10. Nor can this be squared with this Court's acknowledgment in *People v Posey (On Remand)*, 349 Mich App 199, 207; 27 NW3d 137 (2023), that our jurisprudence does not require a sentencing court to explain why a within-guidelines sentence is reasonable and proportionate.

How can a criminal history that justified an *upward departure* for OWI-3rd not justify a *within-guidelines* sentence for PPW? It is a question for which the majority has no answer. It emphasizes the truism that "[w]e *must* consider the circumstances of the offense and the offender

---

[10] Indeed, depending on how one interprets the majority's statement that "the circumstances of the offense did not call for a harsh sentence and perhaps even justified a downward departure," arguably *no* amount of additional criminal history could justify a maximum-minimum sentence in the absence of sufficient aggravating circumstances of the offense itself.

to assess whether a sentence is reasonable" and concludes that defendant's choice not to harm another individual is part of "the circumstances of the offense." But the trial court was required to consider both the offense *and the offender*. The majority acknowledges that defendant's extensive criminal history justifies an upward departure from the recommended minimum sentence range for his OWI-3rd conviction, but that *same criminal history* also informed the trial court's sentence on his PPW conviction—and defendant received only a *within*-guidelines sentence for that offense. Yet the majority says that defendant's "criminal history is not so substantial as to justify . . . a sentence at the top of the guidelines range."

"The premise of our system of criminal justice is that, *everything else being equal*, the more egregious the offense, and the more recidivist the criminal, the greater the punishment." *People v Babcock*, 469 Mich 247, 263; 666 NW2d 231 (2003) (emphasis added). When everything else is not equal, courts must weigh and compare. The principle of proportionality has never precluded a severe sentence for a first-time offender when the offense itself warranted it. Nor has it prevented substantial punishment for a less serious offense when the offender's criminal history was sufficiently extensive. Until, apparently, today, where the majority concludes that the less-serious circumstances of defendant's offense do not merely preclude an upward departure, but specifically require a sentence at its preferred location within the guidelines range.

My fourth concern is that the majority's invocation of defendant's mental health leaves our law in a state of uncertainty.[11] The majority overturns the sentence because defendant's suicide attempt was "in part due to serious mental illness," which was part of "the circumstances of the offense" that courts "must" consider. This is said to qualify as "a sentence that is not proportionate to the unusual circumstances of the offense and the circumstances of the offender." Yet our precedent makes clear that mental health is not a mandatory consideration at sentencing. Where a defendant argued that the trial court failed to consider his psychiatric history, we held that "trial courts are not required to expressly or explicitly consider mitigating factors at sentencing." *People v Bailey*, 330 Mich App 41, 63; 944 NW2d 370 (2019).[12]

---

[11] The majority infers the existence of mental health issues from remarks defendant made during his sentencing allocution. That said, his PSIR specifically notes that although he had previously reported "requiring psychotropic medications," he "wanted this running record changed to reflect that he does not take nor needs to take" such medication. While not flatly contradicting his remarks at allocution, these are in some tension with each other.

[12] *Bailey* does not stand alone. In numerous unpublished opinions, this Court has repeatedly recognized that sentencing courts are not required to expressly consider a defendant's mental health when imposing a sentence. See, e.g., *People v Parrish*, unpublished opinion of the Court of Appeals, issued December 17, 2025 (Docket No. 372130); slip op at 2-3; *People v Davis*, unpublished opinion of the Court of Appeals, issued February 19, 2025 (Docket No. 365572); slip op at 4; *People v Gooldy*, unpublished opinion of the Court of Appeals, issued August 15, 2024 (Docket No. 361190); slip op at 9 n 12; *People v Johnson*, unpublished opinion of the Court of Appeals, issued May 20, 2021 (Docket No. 352007); slip op at 5; *People v Atkins*, unpublished opinion of the Court of Appeals, issued August 13, 2020 (Docket No. 347631); slip op at 7; *People*

The majority tries to get around *Bailey* by observing that these mitigating factors were "available on the record and included within documents the sentencing court *must* consider." But that was precisely the situation in *Bailey*, where "the trial court was clearly aware of the contents of the PSIR, which discussed Bailey's schizophrenia diagnosis." *Id*. at 64. It is all the more remarkable that the majority holds that the trial court erred on this basis when defendant's sentencing memorandum in the trial court did not ask for relief due to mental illness—it says only that he acted "[i]n a moment of despair." As a result, this argument appears to be unpreserved,[13] which means *Bailey* is indistinguishable. The majority's disagreement with *Bailey* does not diminish its binding force. And although the majority tells the reader to "[s]ee" Judge GLEICHER's remarks from her concurring opinion in *People v Bennett*, 335 Mich App 409; 966 NW2d 768 (2021), it is not clear what relevance they could possibly have to the disposition of this case in light of *Bailey*. Yes, trial courts *may* consider mental health as a mitigating factor. But *Bailey* makes clear they are not *obliged* to do so, even when those mental health concerns are documented in the PSIR.

Given the prevalence of mental illness among criminal defendants, elevating mental health to an "unusual circumstance" risks transforming a narrow exception into a routine basis for appellate resentencing. In doing so, we risk losing sight of our role as a reviewing court charged with identifying abuses of discretion, not directing sentencing as though we sat on the trial court.

Finally, separate from the merits, I also question the prudence of today's momentous decision given that our ruling is so unlikely to affect the time defendant actually serves in prison. Defendant is serving his PPW and OWI-3rd sentences concurrently, not consecutively. Although the majority vacates both sentences, the fact that defendant received a 300-month minimum sentence for OWI-3rd and only a 58-month sentence for PPW strongly suggests that even a reduced OWI-3rd sentence will continue to control the length of incarceration after resentencing. In identifying a first-ever "unusual circumstance" sufficient to invalidate a within-guidelines sentence, today's decision redefines how the presumption of proportionality will operate in every single sentencing decision moving forward. But while this *opinion* will reshape Michigan sentencing jurisprudence, resentencing on this *offense* is likely to be nothing more than an academic exercise.

---

*v Thomas*, unpublished opinion of the Court of Appeals, issued March 1, 2018 (Docket No. 335182); slip op at 14; *People v Cornwall*, unpublished opinion of the Court of Appeals, issued October 20, 2015 (Docket No. 322410); slip op at 12; *People v Stokes*, unpublished opinion of the Court of Appeals, issued January 22, 2013 (Docket No. 307529); slip op at 5.

[13] As the majority notes, defendant did reference his mental health struggles in his allocution. But the nature of an allocution is to "permit[] a defendant to speak in mitigation of the sentence." *People v Petty*, 469 Mich 108, 119; 665 NW2d 443 (2003). Since, per *Bailey*, "trial courts are not required to . . . consider mitigating factors at sentencing," there is no error to preserve if the trial court was unpersuaded by defendant's plea for mercy on this basis at allocution.

## V. CONCLUSION

Today's decision is the latest turn in a long-running tug-of-war between the judiciary and the Legislature over criminal sentencing. Prior appellate decisions have by turns undermined legislatively conferred judicial discretion in the name of consistency (*Coles*, *Milbourn*), and legislative efforts to promote consistency in the name of discretion (*Lockridge*). Today's decision manages to do both at once.

*Lockridge*, the most recent development, represented a compromise: The mandatory nature of the sentencing guidelines was struck down, reducing consistency in sentencing, but this freed trial courts to depart from the guidelines recommendation, subject only to deferential appellate review for abuse of discretion. At the same time, and out of respect to the Legislature's prerogative to craft social policy, the Court left the guidelines in place as presumptively proportional benchmarks. Today's decision unsettles that balance by imposing new scrutiny on a reasonable upward departure, while also vitiating the ostensible presumption of proportionality a within-guidelines sentence should enjoy. Because I would not further erode the Legislature's effort to balance consistency and discretion, I respectfully dissent from the decision to vacate defendant's sentences.

/s/ Matthew S. Ackerman